EFiled: Apr 29 2026 09:55AM EDT
Filing ID 79335656
Case Number Multi-Case

IN THE SUPREME COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE THE AES CORPORATION AND OWENS CORNING, | § § § § § § § § § § § | CONSOLIDATED No. 218, 2025 No. 257, 2025 Court Below: Court of Chancery of the State of Delaware C.A. No. 2024-0628 C.A. No. 2024-0688 |

Submitted: February 4, 2026

Decided: April 29, 2026

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en banc*.

Upon appeal from the Court of Chancery. **AFFIRMED.**

Christine M. Mackintosh, Esquire, Rebecca A. Musarra, Esquire, Vivek Upadhya, Esquire, William G. Passannante II, Esquire, GRANT & EISENHOFER P.A., Wilmington, Delaware; Gregory V. Varallo, Esquire, Andrew E. Blumberg, Esquire, Daniel E. Meyer, Esquire, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Edward Timlin, Esquire, Christopher J. Orrico, Esquire, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; Lori Marks-Esterman, Esquire (*argued*), Jacqueline Y. Ma, Esquire, OLSHAN FROME & WOLOSKY, New York, New York; Michele S. Carino, Esquire, GREENWICH LEGAL ASSOCIATES, LLC, Greenwich, Connecticut, *Attorneys for Plaintiffs-Below/Appellants Martin Siegel and George Assad*.

Blake Rohrbacher, Esquire, Matthew W. Murphy, Esquire, John M. O'Toole, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Marjorie P. Duffy, Esquire (*argued*), Elizabeth A. Benshoff, Esquire, Daniel C.

Loesing, Esquire, JONES DAY, Columbus, Ohio, *Attorneys for Defendants-Appellees Brian D. Chambers, Eduardo E. Cordeiro, Adrienne D. Elsner, Alfred E. Festa, Edward F. Lonergan, Maryann T. Mannen, Paul E. Martin, W. Howard Morris, Suzanne P. Nimocks, John D. Williams, Owens Corning, Jay Morse, Gerard M. Anderson, Janet Davidson, Andrés Gluski, Holly Keller Koeppel, Julie Laulis, Alain Monié, Moisés Naim, Teresa Sebastian, Maura Shaughnessy, Tarun Khanna, and The AES Corporation.*

Thomas Curry, Esquire, SAXENA WHITE P.A., Wilmington, Delaware, *Counsel to Amici Curiae Managed Funds Association, James An, Ben Bates, Anat Alon-Beck, Lucian A. Bebchuk, Ilya Beylin, George S. Georgiev, Joan Heminway, Michael Klausner, Mark Lebovitch, and Brian JM Quinn.*

**LEGROW**, Justice:

This consolidated appeal asks whether stockholders who do not intend to nominate directors, and who do not identify a stockholder presently deterred from doing so, may nonetheless obtain declaratory and injunctive relief against advance notice bylaws adopted by two Delaware corporations in 2023. The appellants, who are stockholders in the corporations, seek to challenge the boards' adoption of the bylaws as defensive and entrenching. The Court of Chancery dismissed both actions after concluding that the claims are unripe. We affirm.

Delaware law recognizes that advance notice bylaws are "twice-tested": first for legal authorization and second by equity. But our decision in *Kellner v. AIM ImmunoTech Inc.* also makes clear that those challenges must be "ripe for judicial review."[1] Here, the stockholders who filed these cases expressly disclaimed facial-validity challenges and instead pursued equitable, as-applied claims directed to the boards' adoption of the bylaws. Yet the controversy they present remains abstract. No stockholder has attempted or threatened to nominate directors under the challenged provisions. Neither appellant-stockholder alleges that he intends to run a proxy contest or identifies a stockholder who is presently chilled from doing so. On this record, any ruling on whether these bylaws operate inequitably would amount to an advisory opinion based on hypotheticals about how the bylaws might

---

[1] *Kellner v. AIM ImmunoTech Inc.*, 320 A.3d 239, 259 (Del. 2024).

1

function or be applied in future nomination disputes. We do not hold that an equitable challenge to the adoption of advance notice bylaws can never be ripe absent a rejected nomination. It is enough to say that these complaints, as pleaded, do not present the "genuine, extant controversy" that Delaware's ripeness doctrine requires. We therefore **AFFIRM** the Court of Chancery's dismissal of both actions.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[2]

In November 2021, the Securities and Exchange Commission adopted Exchange Act Rule 14a-19, commonly known as the universal proxy rule. In contested director elections, the rule requires proxy cards to list all candidates duly nominated by management or any dissident, making it easier for stockholders to mix and match among competing slates. In December 2022, SEC staff guidance clarified that dissident nominees are "duly nominated" only if the dissident complies with state law and the company's governing documents, including advance notice bylaws. Accordingly, a corporation may omit a dissident's nominees from its universal proxy card if the dissident fails to satisfy a valid advance notice regime.

Against that regulatory backdrop, both Owens Corning and the AES Corporation revisited their bylaws in 2023. Owens Corning adopted amended

---

[2] Unless otherwise noted, the recited facts are taken from the Court of Chancery's April 14, 2025 and June 2, 2025 Memorandum Opinions. *See Siegel v. Morse*, 2025 WL 1101624 (Del. Ch. Apr. 14, 2025); *Assad v. Chambers*, 2025 WL 1554609 (Del. Ch. June 2, 2025).

bylaws on June 15, 2023. AES adopted amended bylaws on August 1, 2023. The board materials described in the pleadings show that both companies considered the new federal framework and the prospect that universal proxy would lower the barriers to stockholder activism.[3]

The adopted amendments share several features material to the issues on appeal. First, each bylaw package provides that compliance with the advance notice provisions is the exclusive means by which stockholders may nominate directors.

> <u>AES</u>: "Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Corporation . . . and (4) shall be the exclusive means for a stockholder to nominate persons for election to the Board of Directors before an annual meeting or special meeting of stockholders . . . ."[4]

> <u>Owens Corning</u>: "For the avoidance of doubt, Section 1.7(a)(1)(C) will be the exclusive means for nominations or other business to be properly brought before an annual meeting by a stockholder . . . ."[5]

---

[3] For instance, the AES presentation advised that universal proxy would "lower[] barriers" for dissidents "to run a proxy contest and get at least one board seat," that "many companies are revisiting" advance notice requirements "to be able to mount a more effective defense," and that, for noncompliance, "AES may disregard the stockholder nomination." Appellants' Opening Br. at 10–13. The AES presentation further noted that the amendments should be "scheduled to be adopted on a clear day"—i.e., before any proxy contest emerged—so that they could be framed as a general governance update rather than a contest-specific response. Appellants' Opening Br. at 11. Owens Corning received similar guidance: the board was advised to adopt "Enhanced Advance Notice Provision Amendments," which would expand required disclosures because the additional information "may enable the Corporation to mount a stronger defense" against stockholder activists. Appellants' Opening Br. at 14–16.

[4] App. to Appellants' Opening Br. at A196–97 *(*Amended and Restated By-Laws of The AES Corporation § 9.01(A)).

[5] App. to Appellants' Opening Br. at A231–32 (Fourth Amended and Restated Bylaws (As Amended) of Owens Corning § 1.7(c)(5)).

Second, each set of bylaws authorizes the chair or presiding officer to disregard nominations that do not comply with the notice requirements.

> AES: "Except as otherwise provided by law, the Certificate of Incorporation or these By-Laws, the Board of Directors or the person presiding over a meeting of stockholders shall have the power and duty to determine whether any nomination proposed by any stockholder to be brought before the meeting was made or proposed in accordance with the procedures set forth in the applicable section and, if any nomination is not in compliance with such section, then . . . the person presiding over the meeting of stockholders shall have the power and duty to declare that such defective nomination or other business shall be disregarded."[6]

> Owens Corning: "Except as otherwise provided by law, the Amended and Restated Certificate of Incorporation or these Bylaws, only the chair of the meeting shall have the power and duty to determine whether a nomination or any business proposed to be brought before the meeting was made or proposed, as the case may be, in accordance with the procedures set forth in this Section 1.7 and, if any proposed nomination or business is not in compliance with this Section 1.7, to declare that such defective proposal or nomination shall be disregarded . . . ."[7]

Third, each company adopted bylaws containing an "acting in concert" definition that extends beyond formal agreements to encompass conduct knowingly undertaken in parallel with another person toward a common goal, and each set of challenged bylaws includes a "daisy-chain" provision deeming a person acting in

---

[6] App. to Appellants' Opening Br. at A199 (Amended and Restated By-Laws of The AES Corporation § 9.01(C)).

[7] App. to Appellants' Opening Br. at A230–31 (Fourth Amended and Restated Bylaws (As Amended) of Owens Corning § 1.7(c)(1)).

4

concert with one actor also to be acting in concert with any third party who is acting in concert with that actor.

> AES: "For purposes of these By-Laws, a person shall be deemed to be 'acting in concert' with another person if such person knowingly acts (whether or not pursuant to an express agreement, arrangement or understanding) in concert with, or towards a common goal relating to the management, governance or control of the Corporation in parallel with, such other person . . . . A person deemed to be 'acting in concert' with another person shall be deemed to be 'acting in concert' with any third party who is also 'acting in concert' with such other person."[8]

> Owens Corning: "For purposes of this Section 1.7, a person shall be deemed to be 'acting in concert' with another person if such person knowingly acts (whether or not pursuant to an express agreement, arrangement or understanding) in concert with, or towards a common goal relating to the management, governance or control of the Corporation in parallel with, such other person . . . . A person deemed to be 'acting in concert' with another person shall be deemed to be 'acting in concert' with any third party who is also 'acting in concert' with such other person."[9]

Finally, each set of bylaws requires substantial ownership- and relationship-related disclosures, including disclosures concerning derivative interests, legal proceedings, certain contracts or relationships, and performance-based fees.

> AES: "A stockholder's notice must set forth . . . (2) whether and the extent to which any Derivative Instrument or Short Interest . . . has been entered into by or on behalf of such person with respect to stock of the Corporation; . . . (6) any material pending or threatened legal proceeding in which such person is a party or material participant or

---

[8] App. to Appellants' Opening Br. at A183 (Amended and Restated By-Laws of The AES Corporation § 2.15(B)).

[9] App. to Appellants' Opening Br. at A231 (Fourth Amended and Restated Bylaws (As Amended) of Owens Corning § 1.7(c)(3)).

has an interest . . . involving the Corporation or any of its officers or directors, or any affiliate of the Corporation; (7) any other material relationship between such person . . . and the Corporation, any affiliate of the Corporation or any significant competitor of the Corporation; (8) any performance-related fees (other than an asset-based fee) that such person is entitled to based on any increase or decrease in the value of shares of the Corporation, Derivative Instruments, or Short Interests . . . ; [and] (9) any direct or indirect material interest in any material contract or agreement of such person with the Corporation, any affiliate of the Corporation or any significant competitor of the Corporation . . . ."[10]

Owens Corning: "To be properly brought, a stockholder's notice to the Secretary must (A) set forth . . . (iv) whether and the extent to which any Proposing Person holds any voting, investment, pecuniary and/or economic interests, privileges or rights, directly or indirectly, in a security, contract or arrangement relating to the stock or other securities of the Corporation, including without limitation any 'Derivative Instruments' . . . ; . . . (vi) a description of any material pending or threatened legal proceeding involving the Corporation, any affiliate of the Corporation or any of their respective directors or officers, to which such Proposing Person is a party; . . . (viii) a description of any direct or indirect interests of such Proposing Person in any material contract, agreement or relationship with the Corporation, any affiliate of the Corporation or any principal competitors of the Corporation; [and] (ix) a description of any performance-related fees (other than an asset-based fee) to which the Proposing Person or any immediate family member of the Proposing Person may be entitled as a result of any increase or decrease in the value of shares of the Corporation or Derivative Instrument . . . ."[11]

---

[10] App. to Appellants' Opening Br. at A185–86 (Amended and Restated By-Laws of The AES Corporation § 2.16(B)).

[11] App. to Appellants' Opening Br. at A223, A226–27 (Fourth Amended and Restated Bylaws (As Amended) of Owens Corning § 1.7(a)(2)(A)(iv), (vi), (viii), (ix)).

After pursuing books-and-records demands under 8 *Del. C.* § 220, Martin Siegel filed suit challenging AES's amendments, and George Assad (collectively with Siegel, the "Challenging Stockholders") filed a similar action challenging Owens Corning's amendments. The complaints sought declaratory and injunctive relief. Each of the initial complaints advanced claims that the challenged bylaws were facially invalid and that the boards breached their fiduciary duties by adopting them. After our decision in *Kellner*, the Challenging Stockholders amended their complaints to disclaim facial challenges and to proceed only on equitable claims challenging the boards' adoption of the bylaws.

During a June 26, 2024 hearing on Siegel's motion to expedite, Siegel's counsel acknowledged that Siegel did not intend to make a nomination and was not aware of any other stockholder who intended to do so. The Court of Chancery denied expedition. After consolidated motion practice, the Court of Chancery dismissed both amended complaints under Court of Chancery Rule 12(b)(1). The court reasoned that there was no "genuine, extant controversy" to support equitable review because the Challenging Stockholders could not "identify a stockholder who either intends to run a proxy contest" or is "chilled," and "absent any proxy contest

7

threat" the bylaws' adoption was "not the kind of circumstance" that would trigger equitable review under *Kellner*.[12]

These consolidated appeals followed on August 27, 2025.

## II.   STANDARD OF REVIEW

We review questions of justiciability and ripeness *de novo*.[13]

## III.   ANALYSIS

On appeal, the Challenging Stockholders contend that (A) the Court of Chancery mischaracterized their claims as premature enforcement challenges and erred by requiring a pending proxy contest, or an identified chilled nominator, to establish ripeness.[14]  In the Challenging Stockholders' view, the boards' adoption of the bylaws was a completed and static event, ripe for review upon adoption, and enhanced scrutiny can apply in the absence of a live proxy fight.  The Challenging Stockholders also argue that (B), because the ripeness question here overlaps with merits questions concerning defensive purpose and deterrent effect, the court should have proceeded under Rule 12(b)(6) rather than Rule 12(b)(1).[15]

---

[12] *Siegel*, 2025 WL 1101624, at *7; *see also Assad*, 2025 WL 1554609, at *3–4.

[13] *Candlewood Timber Grp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004); *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1216 (Del. 2014); *Crescent/Mach I Partners, L.P. v. Dr Pepper Bottling Co. of Tex.*, 962 A.2d 205, 208 (Del. 2008).

[14] Appellants' Opening Br. at 24.

[15] *Id*. at 50.

AES and Owens Corning respond that, whatever label the Challenging Stockholders give their claims, the relief they seek is forward-looking and depends on how the bylaws might operate in some future nomination dispute. Without any nomination attempt or threatened contest—and given the Challenging Stockholders' concession that they do not intend to nominate directors or know of no stockholder who does—AES and Owens Corning argue that the dispute is hypothetical rather than a "genuine, extant controversy."[16] They further contend that Rule 12(b)(1) was the appropriate vehicle for dismissal but that, in any event, the complaints fail under either procedural standard.[17]

## A. The Challenging Stockholders' claims are unripe.

We held in *Kellner* that advance notice bylaws are "twice-tested": first for legal authorization and second by equity.

> In a challenge to the adoption, amendment, or enforcement of a Delaware corporation's advance notice bylaws that is ripe for judicial review, the court should consider the following: first, if contested, whether the advance notice bylaws are valid as consistent with the certificate of incorporation, not prohibited by law, and address a proper subject matter; and second, whether the board's adoption, amendment, or application of the advance notice bylaws were equitable under the circumstances of the case.[18]

---

[16] *Id*. at 18.

[17] *Id*. at 34.

[18] *Kellner*, 320 A.3d at 246.

Because bylaws are presumed valid, a stockholder who purports to challenge a bylaw's validity must show that the provision cannot operate lawfully under any set of circumstances. If the bylaw has any lawful application, the facial attack fails. An as-applied challenge addresses the second inquiry. It asks whether the board's adoption, amendment, or enforcement of an otherwise valid bylaw was inequitable "under the circumstances of the case."[19] When those circumstances show that the bylaw functioned as a defensive measure affecting the stockholder franchise, the equitable inquiry proceeds under enhanced scrutiny.

*Kellner* makes clear, however, that neither form of review is available in the abstract. Judicial review presupposes a challenge "that is ripe" for such review. *Kellner* explains that bylaw adoption, amendment, and application claims are ripe only when they present a "genuine, extant controversy," such that litigation is "unavoidable" and the "material facts are static."[20] As we clarified in *XL Specialty Ins. Co. v. WMI Liquidating Trust*, a dispute is not ripe when it rests on "uncertain and contingent events that may not occur" or when "future events may obviate the need for judicial intervention."[21] By postponing judicial review until a dispute

---

[19] *Id.*

[20] *Id.* at 258–59 & n.139.

[21] 93 A.3d at 1217–18 (internal quotation marks and citations omitted).

10

assumes a "more concrete and final form," Delaware's ripeness doctrine prevents courts from issuing advisory opinions.[22]

The Challenging Stockholders contend that the Court of Chancery mischaracterized their lawsuits as premature challenges to hypothetical future *enforcement* decisions, when they are instead pursuing fiduciary-duty claims based on the boards' *adoption* of the bylaw packages themselves.[23] The Challenging Stockholders argue that the alleged fiduciary breaches occurred when the boards approved the amendments on a "clear day" after the SEC adopted the universal proxy rule, and that the core facts—the bylaws' terms and the boards' stated rationale— are already fixed, making the disputes sufficiently "static" to proceed now.[24] The Challenging Stockholders further argue that the bylaws are designed to deter nominations before they begin, so requiring a stockholder plaintiff to identify a would-be nominator improperly converts advance notice litigation into "enforcement-only" review; they invoke our decision in *The Williams Companies, Inc. v. Wolosky* to emphasize that deterrent measures can succeed by suppressing activism. On that theory, the absence of a stockholder who comes forward to say,

---

[22] *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989).

[23] Appellants' Opening Br. at 28–29.

[24] *Id*. at 30.

11

"I was chilled," does not defeat ripeness; it may instead confirm the bylaws' effectiveness in deterring activism.[25]

### 1. An as-applied challenge does not immediately ripen upon adoption of a bylaw.

The Challenging Stockholders' argument that the bylaws are ripe for equitable review by virtue of their adoption overlooks the distinction that Delaware law has long drawn between facial and equitable review. The Delaware General Corporation Law ("DGCL") authorizes bylaws as a central mechanism of private ordering, and, when the charter permits, directors may adopt them unilaterally.[26] Bylaws form part of the corporate contract between the corporation and its stockholders. That statutory and contractual foundation explains why facial review is comparatively narrow and deferential—focused on authorization and proper subject matter—while equitable review is situational and fact-bound, particularly where the stockholder franchise is implicated.

This difference also bears on when a bylaw dispute is ripe. A facial validity challenge is fit for judicial review once the bylaw is adopted and operative because the question is a legal one—authorization and permissible scope—answerable from the face of the governing documents. *Boilermakers Local 154 Retirement Fund v.*

---

[25] *Id*. at 39–41.

[26] *See* 8 *Del. C*. § 109(a).

*Chevron Corporation* illustrates this point. There, the Court of Chancery upheld board-adopted forum-selection bylaws on a facial record without waiting for a particular enforcement dispute. The court, however, emphasized that facial validity is only the first "test" and that equitable objections to enforcement arise later: "a plaintiff can challenge the real-world enforcement of a forum selection bylaw," but that review "happens when there is a genuine, extant controversy in which the . . . bylaw is being applied."[27] *Bebchuk v. CA, Inc.* elucidates this point from the other direction. There, the Court of Chancery declined to decide a declaratory challenge to a proposed, not-yet-adopted bylaw, reasoning that adjudicating legality before adoption would require an advisory ruling on an undeveloped record.[28] The Challenging Stockholders argue that *Bebchuk* supports the conclusion that their adoption claims are ripe.[29] Not so. *Bebchuk* treated adoption as a necessary predicate to deciding *facial* validity, not as a blanket rule that all bylaw challenges become ripe upon adoption.

An as-applied equitable challenge stands differently. Delaware precedent consistently cautions against adjudicating equitable enforceability based on "hypothetical abuse" untethered to actual use. In *Stroud v. Grace* ("*Stroud II*"), we

---

[27] *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 949 (Del. Ch. 2013).

[28] *Bebchuk v. CA, Inc.*, 902 A.2d 737, 744–45 (Del. Ch. 2006).

[29] Appellants' Opening Br. at 32–33 ("*Bebchuk* thus supports that these Cases are ripe.").

13

rejected an attempt to invalidate a nomination-related bylaw based on speculative misuse, explaining that there was "no basis to invalidate" the bylaw "upon some hypothetical abuse" and that a determination as to the validity of the corporate action "must await its actual use."[30]

That caution is consistent with the posture of the cases that the Challenging Stockholders cite in which Delaware courts set aside defensive governance actions under enhanced scrutiny: those cases arose from concrete, time-sensitive disputes in which the challenged acts had immediate, identifiable consequences for corporate control or the stockholder vote.[31] In *MM Companies, Inc. v. Liquid Audio, Inc.*, for example, the board expanded its size and filled the new seats on the eve of a contested annual meeting; the challenge proceeded on an expedited basis because the board's actions directly affected the imminent election outcome.[32] And in *Hollinger International, Inc. v. Black*, the challenged bylaw amendments were adopted amid an active intra-company dispute over control and a pending transaction, and the court found that the bylaw amendments operated to strip an independent committee of authority at the very moment that the parties' rights and

---

[30] *Stroud v. Grace*, 606 A.2d 75, 95–96 (Del. 1992) [hereinafter *Stroud II*].

[31] *See* Appellants' Opening Br. at 32.

[32] *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1120–22 (Del. 2003).

the board's ability to act were being contested.[33] These cases underscore the same point: equitable review typically proceeds on a developed, adversarial record where the challenged action has immediate consequences, not on conjecture about how bylaws might operate in future contests.

*Stroud v. Grace* ("*Stroud II*") is especially instructive here. If adoption alone were sufficient to ripen an equitable claim, there would have been no reason to insist that a challenge to the bylaw's validity in *Stroud II* "must await its actual use." The bylaw at issue in *Stroud II* was not trivial. It required stockholders to provide advance notice of director nominees, demanded disclosure of the nominees' qualifications, and empowered the board to disqualify a nominee even at the annual meeting.[34] Still, we refused to invalidate the bylaw based on "some hypothetical abuse."[35] That approach is difficult to reconcile with the Challenging Stockholders' claim that adoption, standing alone, is sufficient to ripen an as-applied challenge or that these consolidated claims are ripe for judicial review.

The Challenging Stockholders' central problem is the absence of a would-be nominator. In the advance notice context, an as-applied fiduciary-duty challenge

---

[33] *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1080–84 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005).

[34] *Stroud II*, 606 A.2d at 80, 92–93 (describing Article Eleventh (c) and By-law 3).

[35] *Id.* at 95.

ordinarily becomes justiciable only when a real nomination controversy exists—*i.e.*, when a stockholder has stepped forward to nominate, or credibly threatened to do so, and the court can assess the bylaw's operation on a concrete record rather than in the abstract.

*In re Allergan, Inc. Stockholder Litigation* offers a close analogue and illustrates why as-applied bylaw claims may be unripe even when corporate control and activist pressure are actively in play. Allergan faced intense activist and deal pressure, and the company had recently adopted governance changes that allowed stockholders holding 25% of the company's outstanding stock to call a special meeting and later to act by written consent—both accompanied by a "Similar Item" limitation designed to prevent stockholders from repeatedly presenting the same or substantially similar matters within a short window. Yet the plaintiffs did not present an actual governance contest over those provisions' application; instead, they sought a declaratory ruling blessing a hypothetical "remove-and-replace" strategy— removing the entire board and electing a full replacement slate in one stockholder action—without any stockholder actually pursuing that course. The Court of Chancery ruled that the claims were unripe because the request required the court to opine on how the provisions "might apply in a hypothetical situation," and "no stockholder [was] currently pursuing" the proposed strategy, rendering the dispute

16

advisory.[36]   Like *Allergan*, the Challenging Stockholders have identified no stockholder "currently pursuing," or credibly preparing to pursue, a nomination under the challenged bylaws, leaving the court to hypothesize about future application.

*Openwave Systems, Inc. v. Harbinger Capital Partners Master Fund I, Ltd.* evinces the same aversion to hypothetical adjudication while exhibiting the kind of concrete record that courts typically require to evaluate advance notice bylaws in equity.[37]   There, Harbinger delivered a nomination notice for Openwave's annual meeting, and the company challenged the nominations in a Section 225 proceeding. In addition to arguing that the nominations complied with the deadlines in the advance notice bylaws, Harbinger also attacked the bylaws as confusing and urged the court to excuse noncompliance.   In support of that effort, Harbinger pointed to hypothetical scenarios in which the bylaw structure could leave stockholders with an "unreasonably short" time to comply and suggested that ambiguity could operate as a trap for dissidents.   The court resolved the dispute on the concrete nomination

---

[36] *In re Allergan, Inc. S'holder Litig.*, 2014 WL 5791350, at *7–8 (Del. Ch. Nov. 7, 2014). *Allergan* was decided on a motion for summary judgment.   The plaintiffs sought prompt declaratory relief and moved for partial summary judgment on June 18, 2014.   At oral argument on July 23, 2014, the court raised ripeness *sua sponte* and ordered supplemental briefing on the issue.   Therefore, the court never had the opportunity to resolve ripeness on a motion to dismiss.

[37] *Openwave Sys. Inc. v. Harbinger Cap. P'rs Master Fund I, Ltd.*, 924 A.2d 228, 231–33, 240 (Del. Ch. 2007).

record—the meeting announcement, the timing of Harbinger's notice, and the bylaw text—concluding that Harbinger missed the relevant deadlines and rejecting any equitable excuse on the facts presented. Importantly, the court refused to invalidate or disregard the bylaws based on hypothetical abuses and "possible scenarios" untethered to the record, reiterating that Delaware law does not adjudicate governance provisions on imagined future applications.[38] Together, *Allergan* and *Openwave* underscore the same constraint: equitable review of nomination machinery is anchored to a mature, real-world controversy, not abstract predictions about how bylaws might operate in future contests.

### 2. The Challenging Stockholders' deterrence arguments do not create a ripe dispute.

The Challenging Stockholders nevertheless insist that they need not identify a would-be nominator because, in their view, the adoption itself supplies the necessary "genuine, extant controversy": the bylaws are alleged to operate as deterrents the moment that they are adopted.[39] The Challenging Stockholders point to the universal-proxy-rule board presentations as evidence of design and purpose— citing statements that companies were revisiting advance notice provisions "to be able to mount a more effective defense" and that noncompliance would allow the

---

[38] *Id.*

[39] Appellants' Opening Br. at 43.

company to disregard a nomination. The Challenging Stockholders then argue that the "clear day" package was crafted to chill pre-contest coordination and make nominations riskier and more costly before any proxy fight begins.[40]

The Challenging Stockholders invoke *Williams* to contend that courts should not demand that a would-be nominator come forward under these circumstances. In the Challenging Stockholders' view, deterrent measures can succeed precisely by suppressing activism before it materializes—making it "not incumbent" on a plaintiff to "prove a negative" by identifying the very challengers that the deterrent is designed to deter.[41] The Challenging Stockholders further argue that the challenged "wolfpack/conscious parallelism" and "daisy chain" acting-in-concert provisions mirror the sort of group-expansion and communications-chilling features criticized in *Williams*, and thereby plausibly deter coordination even absent an active contest. The Challenging Stockholders also analogize to deterrence-based ripeness cases such as *Solak v. Sarowitz* and *Pontiac General Employees' Retirement System v. Ballantine*, where the challenged provisions were treated as ripe for review at the motion to dismiss stage because their threatened consequences were so severe that it was "highly unlikely that any rational stockholder" would trigger the mechanism

---

[40] *Id.* at 44–46.

[41] *Id.* at 46–48; *see also In re Williams Cos. S'holder Litig.*, 2021 WL 754593, at *38–39 (Del. Ch. Feb. 26, 2021), *aff'd sub nom. Williams Cos. v. Wolosky*, 264 A.3d 641 (Del. 2021) (TABLE).

needed to provoke judicial review.[42]  On that view, requiring an identified would-be nominator would create a "Catch-22" that insulates "clear day" nomination tripwires from equitable scrutiny.

The Challenging Stockholders are correct that Delaware courts have, in limited contexts, credited deterrence as a present harm even when the challenged device has not yet been "triggered" in the ordinary sense.  In *Williams*, the Court of Chancery rejected the premise that the plaintiff always must identify a deterred activist as a prerequisite to reviewing a defensive measure, reasoning that deterrence can work precisely by preventing activism from surfacing.[43]  In *Solak*, the court held that the claim was ripe because the fee-shifting bylaw's threatened consequence—a potentially ruinous fee award—made it "highly unlikely that any rational stockholder" would bring the very suit that would generate later review.[44]  In *Pontiac*, the court treated a proxy-put challenge as justiciable where the alleged deterrent was designed to operate by warning stockholders away from supporting an insurgent slate—*i.e.*, by discouraging the triggering event itself.[45]

---

[42] *Solak v. Sarowitz*, 153 A.3d 729, 737–38 (Del. Ch. 2016); *Pontiac Gen. Emps.' Ret. Sys. v. Ballantine*, C.A. No. 9789-VCL, at 73:1–2 (Del. Ch. Oct. 14, 2014) (TRANSCRIPT) (observing that "a truly effective deterrent is never triggered").

[43] 2021 WL 754593, at *38.

[44] 153 A.3d at 737–38.

[45] *Pontiac*, at 72:17–73:5, 77:11–12 (TRANSCRIPT).

But the Challenging Stockholders' theory would require us to treat these advance notice bylaws as functionally equivalent to the deterrent devices in *Williams*, *Solak*, and *Pontiac*. In practical terms, the Challenging Stockholders ask us to conclude that the bylaws' nomination regime is so chilling that adoption itself should be treated as the operative trigger for ripeness because one cannot reasonably expect a stockholder ever to come forward and generate a concrete nomination dispute. That premise is difficult to reconcile with *Kellner*'s insistence that equitable review proceeds only in "real-world and extant disputes," with "static" material facts, where litigation is "unavoidable."[46]

The difficulty is that advance notice bylaws do not impose the same kind of self-executing, economically coercive consequence that created ripeness in the deterrence cases that the Challenging Stockholders invoke. A poison pill like the one at issue in *Williams* causes immediate dilution if triggered; a fee-shifting bylaw like the one in *Solak* imposes direct personal liability for attorneys' fees; and a proxy put like the one at issue in *Pontiac* triggers automatic debt consequences tied to board change. By contrast, an advance notice bylaw principally imposes procedural and disclosure obligations on a would-be nominator (and potentially its "group").

---

[46] 320 A.3d at 258–59 & n.139.

The Challenging Stockholders are correct that mounting a nomination and proxy contest can be expensive and uncertain—including the costs of soliciting proxies, preparing disclosures, and, if a dispute arises, litigating on an expedited schedule—but those are the ordinary incidents of a contested election and do not, by themselves, render the nomination machinery preclusive in the way that an automatic economic penalty can. Nor do the asserted "wolfpack" and "daisy chain" similarities to *Williams* resolve the ripeness problem. Those similarities go to the merits of whether the bylaws are disproportionate or unduly chilling in operation and not to whether the dispute is presently ripe for adjudication. Without a nominator, a court cannot know who would be swept into an acting-in-concert group, what disclosures would actually be triggered, whether compliance would be feasible on the facts presented, or whether the company would in fact reject a nomination. Even assuming that the challenged provisions are aggressive in the abstract, their alleged chilling effect is not a self-executing consequence of adoption. The bylaws' effect depends on how they would operate in a concrete nomination setting. That is why our advance notice cases, such as *Openwave*, adjudicate enforceability on a nomination record, and why *Allergan* treated a request to bless a hypothetical governance strategy as unripe even amid ongoing activism.[47]

---

[47] *See Openwave*, 924 A.2d at 240; *Allergan*, 2014 WL 5791350, at *7–8.

### 3. The Challenging Stockholders' policy concerns do not support judicial review of a hypothetical dispute.

Finally, the Challenging Stockholders invoke a policy concern. They argue that, if equitable review is unavailable until a nomination dispute arises, aggressive "clear day" advance notice bylaws may evade challenge because no proxy contest may materialize within the limitations period.[48] In the Challenging Stockholders' view, our decision in *Moelis & Co. v. West Palm Beach Firefighters' Pension Fund* supports that concern. There, we held that a facial challenge to a governance arrangement accrued at a stockholder agreement's adoption because "the only wrongful conduct alleged" was the original execution of the agreement.[49] The Challenging Stockholders therefore say that, if adoption-based review is deferred until a future contest emerges, the limitations period may expire before that contest ever materializes. But *Moelis* also made clear that "as-applied challenges may be advanced after the period for bringing facial challenges has expired."[50] *Moelis* does not foreclose a later, as-applied challenge once a real nomination dispute exists, and it does not prevent a stockholder from putting forth evidence of a board's motives

---

[48] Appellants' Opening Br. at 67–68.

[49] *Moelis & Co. v. W. Palm Beach Firefighters' Pension Fund*, —A.3d—, 2026 WL 184868, at *1 (Del. Jan. 20, 2026).

[50] *Id.* at *17.

for adopting the bylaws or arguing that the bylaws are draconian and do not withstand enhanced scrutiny.

We need not decide today whether circumstances might exist in which an as-applied challenge could proceed without an identified would-be nominator—for instance, where the challenged bylaws' operation imposes concrete, present burdens on stockholder conduct untethered to any nomination attempt, or where a would-be challenger can plead non-conclusory facts regarding the real-world deterrent effect of a particular provision.[51] The Challenging Stockholders have pleaded nothing of that character, and we leave any such theory for a case that presents it.

Affirmance does not leave stockholders powerless. Even absent a ripe enforcement dispute, stockholders retain familiar tools to respond to aggressive bylaw regimes. They may vote against directors, propose bylaw amendments under Section 109, wage "withhold" campaigns, and use Section 220 to investigate the board's process and rationale. And if a stockholder does decide to nominate directors, the "real-world and extant dispute" required by *Kellner* will exist—either

---

[51] Oral Argument, at 28:51–29:17, *In re AES Corp. & Owens Corning*, Nos. 218, 2025 & 257, 2025 (Del. Feb. 4, 2026) (counsel for AES and Owens Corning acknowledging that "[t]here may be instances somewhere in the middle where there is an adoption claim that presents something more than conclusory assertions of deterrent [effect], borrowing from inapplicable corporate instruments like stockholder rights plans," but contending that "that's not what we have here" because the Challenging Stockholders had neither "submitted anything" nor "expressed any interest in submitting anything that would . . . trigger those bylaws").

24

because the company accepts the nomination, in which event no injury arises, or because the company rejects it, in which event a concrete record will support expedited, as-applied equitable review.  Accordingly, our decision does not insulate "clear day" bylaws from scrutiny.  It reflects only that fiduciary review must await the posture in which Delaware courts can assess actual operation and consequences rather than hypothetical future applications.

## B.    Rule 12(b)(1) was an appropriate vehicle for dismissal.

The Challenging Stockholders separately request reversal on procedural grounds.  They argue that the Court of Chancery applied the wrong procedural lens by treating ripeness as a Rule 12(b)(1) question and by relying on facts outside the pleadings.  In their view, ripeness here "closely intersect[s]" with the merits of their *Unocal* claim—namely, whether the bylaws have present deterrent effects and were adopted for a defensive purpose—so the court should have applied the plaintiff-friendly Rule 12(b)(6) standard.[52]  They rely heavily on *Appriva Shareholder Litigation Co. v. ev3, Inc.*, in which we held that when the "jurisdictional facts are intertwined with the facts central to the merits of the dispute," the issue is "more properly decided under Rule 12(b)(6)" and the factual dispute should be resolved on the merits.[53]

---

[52] Appellants' Opening Br. at 51–55.

[53] *Appriva S'holder Litig. Co. v. ev3, Inc.*, 937 A.2d 1275, 1285–86 (Del. 2007).

AES and Owens Corning respond that ripeness is a threshold justiciability requirement appropriately addressed under Rule 12(b)(1) in an action seeking declaratory and injunctive relief,[54] and that the Challenging Stockholders forfeited their Rule 12(b)(6) theory by not raising it below.[55] AES and Owens Corning further argue that *Appriva* is inapposite because it concerned a question of standing that required the court to interpret the contract at the heart of the merits; here, they contend, the Court of Chancery could decide ripeness without reaching the merits because there is no nomination attempt, no threatened contest, and the Challenging Stockholders conceded that they do not intend to nominate or know of anyone who does.[56]

We need not resolve the forfeiture argument. Even assuming the Challenging Stockholders sufficiently preserved the issue, their position fails on the merits.

Rule 12(b)(1) was an appropriate vehicle to resolve the ripeness issue in this case. The Challenging Stockholders seek declaratory and injunctive relief. In that setting, the existence of an actual controversy is a threshold requirement.[57] Where

---

[54] Appellees' Answering Br. at 34–36.

[55] *Id*. at 37–40.

[56] *Id*. at 41–44.

[57] 10 *Del. C.* § 6501 (the Declaratory Judgment Act); *Ackerman v. Stemerman*, 201 A.2d 173, 175 (Del. 1964) ("The existence of an actual controversy between the parties is a jurisdictional fact in actions for declaratory judgments."); *Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662–63 (Del. 1973) (adopting the four-part "actual controversy" test).

the alleged harm depends on "uncertain and contingent events that may not occur" and "future events that may obviate the need for judicial intervention," dismissal at the threshold is appropriate.[58] "Actual controversy" and ripeness objections in declaratory actions are routinely presented and decided under Rule 12(b)(1),[59] and the court may consider materials outside the complaint in resolving subject-matter jurisdiction.[60]

Our decision in *Appriva* does not compel Rule 12(b)(6) treatment here. *Appriva* did not establish a categorical rule that ripeness must be decided under Rule 12(b)(6) whenever a plaintiff pleads a merits theory. In *Appriva*, the plaintiffs' standing turned on how the court interpreted the contract that also supplied the merits of their breach-of-contract claim. Because standing could not be resolved without "determining the merits" of the contract dispute, we held that the issue was "more

---

[58] *XL Specialty*, 93 A.3d at 1217 (stating that a dispute is not ripe when it is based on "uncertain and contingent events that may not occur" and "future events may obviate the need for judicial intervention").

[59] *See, e.g.*, *Klein v. ECG Topco Hldg., LLC*, 2022 WL 2659096, at *5–6 (Del. Ch. July 8, 2022) (dismissing largely as unripe under Rule 12(b)(1)); *VT S'holder Representative, LLC v. Edwards Lifesciences Corp.*, 2023 WL 8597956, at *6–8 (Del. Ch. Dec. 12, 2023) (dismissing as unripe under Rule 12(b)(1)); *Cedarview Opportunities Master Fund, L.P. v. Spanish Broad. Sys., Inc.*, 2018 WL 4057012, at *9–10 (Del. Ch. Aug. 27, 2018) (addressing ripeness under Rule 12(b)(1) in declaratory setting).

[60] *See, e.g.*, *K&K Screw Prods., LLC v. Emerick Cap. Invs., Inc.*, 2011 WL 3505354, at *6 (Del. Ch. Aug. 9, 2011) ("This Court will dismiss an action under Rule 12(b)(1) if the record, which may include evidence outside of the pleadings, indicates that the Court does not have subject matter jurisdiction over the plaintiff's claim."); *Maloney-Refaie v. Bridge at Sch.*, Inc., 958 A.2d 871, 882 n.29 (Del. Ch. 2008) (stating that Rule 12(b)(1) permits consideration of matters outside the pleadings and places the burden on the plaintiff to establish jurisdiction).

properly" addressed under Rule 12(b)(6) and cautioned against using Rule 12(b)(1) to resolve merits-adjacent factual disputes without the protections of merits adjudication.[61] *Appriva* does not suggest that a court must treat ripeness as a Rule 12(b)(6) question whenever the plaintiff alleges a merits theory; the pivot point is whether adjudicating justiciability requires simultaneously resolving merits-central facts. Rule 12(b)(6) is the proper vehicle only when the justiciability objection cannot be separated from the merits, such as when deciding whether the plaintiff may proceed necessarily decides whether the plaintiff has adequately alleged an element of the substantive claim.

That is not this case. The Court of Chancery did not dismiss the Challenging Stockholders' complaints by resolving a merits-adjacent factual dispute about whether the bylaws are defensive, coercive, or preclusive under enhanced scrutiny. The court dismissed the Challenging Stockholders' claims because the complaints allege no actual or threatened nomination, no rejected nomination notice, and no identified stockholder presently chilled from nominating directors. Those facts bear on whether a genuine, extant controversy exists; they do not require the court to decide whether the Challenging Stockholders ultimately would prevail in a ripe

---

[61] *Appriva*, 937 A.2d at 1285–86.

28

challenge. Put differently, the ripeness defect here is antecedent to the merits, not intertwined with them in the *Appriva* sense.

Finally, even if Rule 12(b)(6) applied, the result would not change. A plaintiff-friendly standard does not authorize a court to issue declaratory or injunctive relief based on an abstract set of future contingencies. Here, the Challenging Stockholders allege no actual or imminent nomination controversy and concede no intent to nominate; the asserted injury rests on what hypothetical future nominators might do and how the companies might respond. That is not a ripe "actual controversy" under either Rule 12(b)(1) or Rule 12(b)(6).

## IV. CONCLUSION

For the foregoing reasons, the judgments of the Court of Chancery are **AFFIRMED**.

# Multi-Case Filing Detail: The document above has been filed and/or served into multiple cases, see the details below including the case number and name.

## Transaction Details

**Court:** DE Supreme Court

**Transaction ID:** 79335656

**Document Type:** Opinion

**Document Title:** Opinion decided 4-29-26 by LeGrow, J. For the foregoing reasons, the judgments of the Court of Chancery are AFFIRMED. (CJS, KLV, GFT, AML, NCG) (rl)

**Submitted Date & Time:** Apr 29 2026 9:55AM

## Case Details

| Case Number | Case Name |
|---|---|
| 218,2025C | In Re: The AES Corporation and Owens Corning |
| 257,2025C | In Re: The AES Corporation and Owens Corning |